IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CHRISTOPHER A. FRANCIS,　　　）
　　　　　　　　　　　　　　）
　　　　　　Plaintiff,　　　　）
　　　　　　　　　　　　　　）
　　　　v.　　　　　　　　　）　　　C. A. No. 15-936-CFC/MPT
　　　　　　　　　　　　　　）
CAROLYN W. COLVIN　　　　　）
Acting Commissioner of　　　　）
Social Security,　　　　　　　）
　　　　　　　　　　　　　　）
　　　　　　Defendant.　　　　）


## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This action arises from the denial of plaintiff's claim for Social Security benefits. On December 28, 2011, plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act").[1]  Plaintiff alleged disability as of June 30, 2009, the last date of his employment with the New York Police Department ("NYPD").[2]  In his application and disability report, plaintiff listed several medical conditions affecting his ability to work, among them hypertension, diabetes mellitus, back pain and related impairments of the spine, cardiovascular disease, acid reflux, and high cholesterol.[3]

Plaintiff's Title II application was initially denied on March 15, 2012, and denied again upon reconsideration on October 5, 2012.  On October 18, 2012, Plaintiff

---

[1] D.I. 7-2 at 52.
[2] Id. at 54-55.
[3] D.I. 7-6 at 154.

requested a review of his application before an Administrative Law Judge ("ALJ") and on April 17, 2014, a hearing occurred before ALJ Irving A. Pianin.[4]  At the hearing, testimony was given by plaintiff and an impartial vocational expert, Samuel Edelmann (hereafter referred to as "Edelmann").[5]  On May 14, 2014, the ALJ issued a written decision denying plaintiff's claims for a third time.[6]  Plaintiff sought review of the ALJ's decision by the Social Security Appeals Council, but his request was denied on August 24, 2015.[7]  Plaintiff then filed a timely appeal with this court on October 15, 2015.[8] Presently before the court are the parties' cross-motions for summary judgment.  For the reasons that follow, it is recommended that defendant's motion be granted.

## II.    BACKGROUND

Plaintiff was born May 20, 1964.[9]  He has a high school education and two years of college.[10]  He was employed for almost twenty years as a police officer with the NYPD before retiring in June 2009 due to a disqualifying heart condition.[11]  At the time of his retirement, plaintiff was forty-five years old. Plaintiff is now fifty-five years old and has not been employed in any capacity since June 30, 2009.[12]

Plaintiff presently lives in Bear, Delaware with his girlfriend.[13]  As a retiree, he receives a pension from the city of New York in a monthly amount in excess of

---

[4] D.I. 7-2 at 50.
[5] *Id.* at 53, 70.
[6] *Id.* at 23-34.
[7] D.I. 7-6 at 224;  D.I. 11 at 1.
[8] D.I. 1.
[9] D.I. 7-2 at 32.
[10] *Id.* at 53.
[11] *Id.* at 55, 72.
[12] *Id.* at 54.
[13] D.I. 7-2 at 53.

$5,700.[14]

## A. Evidence Presented

While plaintiff cited a number of medical conditions as reason for his alleged disability, he focuses his appeal on his back pain and spine impairments. He contends that the ALJ's evaluation of these impairments in the overall disability analysis was flawed. Plaintiff specifically objects to the evidentiary weight afforded to non-treating physicians' medical opinions and the ALJ's assessment of plaintiff's credibility regarding how these impairments affect his activities of daily living ("ADL"). Therefore, the court will address only the record evidence relevant to plaintiff's musculoskeletal impairments.

### 1. Medical Record Evidence

On July 14, 2009, plaintiff sought treatment for his left shoulder at Westmed Medical Group Physical Medicine and Rehabilitation Clinic ("Westmed") in Yonkers, NY.[15] There, he was seen by Sherri Kunjbehari, P.A. and prescribed oxycodone for pain related to a tendon tear in his left shoulder (for which he had previously undergone surgery) and severe thoracic kyphosis, as noted in the physical assessment.[16] Plaintiff rated his pain a 6.5 out of 10 without medication and reported pain radiated into his right leg.[17] Subsequent visits through May 2010 reflected no change in his condition; plaintiff was continued on his regimen of pain medication.[18]

---

[14] *Id.* at 54; Plaintiff identified it as an "Article 2 . . . Heart Bill" pension.
[15] D.I. 7-10 at 650.
[16] *Id.* at 650-51.
[17] *Id.*
[18] *Id.* at 623-49.

3

On June 3, 2010, plaintiff was seen by Dr. Yuting Xiong, an orthopedist at Westmed.[19]  Plaintiff then rated his pain a 10 out of 10.[20]  He related he had intermittent numbness in his thighs, but denied any radiating pain or weakness in either limb.[21]  He described the pain as "aching and throbbing", which was only somewhat relieved by his previously-prescribed pain medication.[22]  He tried heat application, trigger point injections, and physical therapy to no avail in the past.[23]  Plaintiff further stated that the pain interfered with sleep.[24]

On examination, Dr. Xiong observed limitations in plaintiff's lumbar spine flexion with lateral bending and extension of 30% and 50% respectively.[25]  He noted that plaintiff's left SLR and left FABER test aggravated his lower back pain and that plaintiff experienced tenderness over his left buttock upon palpation.[26]

However, the examination also revealed normal tendon reflexes, normal motor strength, normal sensation in both upper and lower limbs, normal lumbar spine rotation, no muscle atrophy or loss of tone, no evidence of joint instability or laxity, and no

---

[19] D.I. 7-10 at 619.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] D.I. 7-10 at 619.
[24] *Id.*
[25] The court notes some discrepancy in Dr. Xiong's reports as to these figures. A portion of the "Focused Lumbar" section of the report is duplicated – the added paragraph contains slightly different figures than those in the paragraphs above it. However, the numbers applied herein are consistent with Dr. Blanco's subsequent lumbar assessments over the course of three years. Plaintiff would otherwise have the court rely on Dr. Blanco's medical assessment, so it will.
[26] D.I. 7-10 at 621.

aggravating lower back pain during lumbar range of motion.[27]  Furthermore, plaintiff exhibited no pain behaviors, a nonantalgic gait, and normal respiratory effort.[28]  He was pleasant, cooperative, alert and oriented, and could walk on his heels and toes without difficulty or aggravating lower back pain.[29]

Dr. Xiong diagnosed thoracic spondylosis, low back pain syndrome, and thoracic spine pain.[30]  Joint injections were discussed, but plaintiff desired to continue with pain medication instead.[31]  A follow-up appointment on July 29, 2010 offered no new findings, despite plaintiff reporting new pain in his hands and fingers.[32]

On August 31, 2010, plaintiff was referred to Dr. Cy Blanco, a pain management specialist at Westmed, for further assistance with his back pain.[33]  Plaintiff's condition remained unchanged; he described feeling generally "uncomfortable" from the cervical area of his spine to the lumbar region.[34]  Although "multiple injections" in the past had afforded only limited relief, plaintiff represented that his current medical treatment "improved his quality of life."[35]  He further stated that he was exercising to the best of his ability, despite muscular aches when he stood.[36]

The physical examination yielded the same results as the prior month's visit with Dr. Xiong – Dr. Blanco noted the same limitations of the spine in flexion, bending, and

---

[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] D.I. 7-10. at 622.
[31] *Id.*
[32] *Id.* at 615-18.
[33] *Id.* at 611.
[34] D.I. 7-10 at 611.
[35] *Id.*
[36] *Id.*

extension, the same SLR and FABER test results, and the same tenderness upon palpitation.[37] Moreover, Dr. Blanco also made the same normal findings as to plaintiff's range of motion, tendon reflexes, muscle tone, joint stability, motor strength, sensation, lack of pain behavior, mood/affect, and ambulation.[38] He assessed total spinal pain secondary to kyphoscoliosis and, noting that plaintiff was "medically managed," continued his current medication regimen.[39]

Dr. Blanco's findings remained unchanged in subsequent monthly visits from September 2010 to November 2013. In October 2010, Dr. Blanco added long-acting Oxycontin to plaintiff's medications after he indicated experiencing increased pain.[40] However, plaintiff found the initial dosage "too strong" and reduced it from twice daily to once at bedtime, which allowed him to sleep without pain.[41] Like his colleague before him, Dr. Blanco discussed the possibility of joint injections, but plaintiff opted again to continue with pain medication.[42]

While on pain medication, plaintiff was active with his "home PT and his ADLs," which Dr. Blanco noted in a September 2011 visit.[43] With increased activity came reports of increased pain.[44] In April 2011, plaintiff reported non-radiating coccygeal pain caused by a stationary bike.[45] Dr. Blanco did not note any pain behavior or

---

[37] *Id.* at 613.
[38] D.I. 7-10 at 613.
[39] *Id.*
[40] *Id.* at 603, 606.
[41] *Id.* at 599.
[42] D.I. 7-10 at 609.
[43] *Id.* at 568.
[44] *Id.* at 587.
[45] *Id.* at 583.

antalgia, and plaintiff could walk on his heels and toes without pain.[46]  Plaintiff was advised to use a sacral donut and to continue his medication, on which he reported doing well.[47]  In June 2011, plaintiff described feeling sore after exercising, but was otherwise "stable on current meds" and had no new complaints.[48]  In a December 2011 visit to a different Westmed provider for increased back pain, plaintiff described getting "a cardio workout" washing his car and walking two miles before exacerbating pain in his buttocks and legs.[49]  In January 2012, plaintiff stated his current regimen provided "adequate pain relief" and that he would continue exercising within his limits.[50]

At several points throughout his treatment with Dr. Blanco, plaintiff decreased or even ceased regular usage of his pain medication.  In the same January 2012 visit, plaintiff agreed he would be "cutting back on oxycontin as tolerated."[51]  In May and August 2012, plaintiff reported not taking his Oxycontin regularly.[52]  At both visits, Dr. Blanco determined that plaintiff's "low back pain [was] stable on current medication regimen."[53]  In March 2013, Dr. Blanco added a pain patch to plaintiff's medications; plaintiff described that it was "better than Oxycontin."[54]  In May 2013, plaintiff reported using less of his oxycodone as a result of the patch.[55]  The comment in Dr. Blanco's

---

[46] D.I. 7-10 at 584.
[47] *Id.* at 585.
[48] *Id.* at 576.
[49] *Id.* at 556.
[50] D.I. 7-10 at 552.
[51] *Id.* at 554.
[52] *Id.* at 536, 548.
[53] *Id.* at 538, 550.
[54] D.I. 7-11 at 706.
[55] *Id.* at 702.

office notes of "[d]oing better with Patch" continued in subsequent visits.[56]

Plaintiff routinely denied experiencing any side effects, weakness or incontinence during his treatment with Dr. Blanco.[57]  Dr. Blanco's findings as to plaintiff's physical impairments, pain behavior, mood/affect, and ambulation never changed.[58]  Plaintiff remained stable on medications through November 2013, his last visit to Dr. Blanco in the record.[59]

On December 7, 2012, Dr. Blanco completed a "Spinal Impairment Questionnaire" provided to him by plaintiff's counsel.[60]  In it, he noted plaintiff suffered from "low back pain syndrome," "thoracic spondylosis," and "coccygeal pain."[61]  He cited a number of positive clinical findings in support, including those already in the record (i.e. limitations on lumbar extension and lateral bending/flexion, positive SLR test, tenderness) and others not recorded in his appointment notes, such as lumbar paraspinal muscle spasms, bilateral lower extremity muscle weakness, and trigger points at the lumbar paraspinal muscles.[62]  Plaintiff's primary symptoms, according to the questionnaire, were "weakness in lower extremities" and "back pain with limited range of motion."[63]  Dr. Blanco described plaintiff's pain as constant, frequently severe enough to interfere with attention and concentration, and brought on by "walking,

---

[56] *Id.* at 682, 706, 702.
[57] D.I. 7-10 at ; D.I. 7-11 at .
[58] D.I. 7-10 at ; D.I. 7-11 at
[59] D.I. 7-11. at 679.
[60] D.I. 7-10 at 529-35.
[61] *Id.* at 529.
[62] *Id.* at 529-30.
[63] *Id.* at 531.

prolonged standing/sitting."[64]  He noted, however, that he had been able to "completely relieve [plaintiff's] pain with medication without unacceptable side effects."[65]  Despite this, he represented that plaintiff could only perform less than sedentary work due to the impairments listed.[66]

On April 3, 2014, Dr. Blanco completed a second "Spinal Impairment Questionnaire" with updated responses.[67]  He diagnosed plaintiff with "thoracic spondylosis" and "low back pain," and supplemented his previous findings of tenderness and muscle spasms with new findings of bilateral reflex changes in the knees.[68]  While he no longer noted any trigger points or muscle weakness, Dr. Blanco included left shoulder pain in his diagnosis, citing an MRI from 2008 showing a "partial rotator cuff tear."[69]  Plaintiff's primary symptoms were changed to reflect "mid & low back pain with radiation to his bilateral legs" and "subjective weakness."[70]  Dr. Blanco again described plaintiff's pain as constant and brought on by activity and prolonged sitting/standing, but now "constantly" interfered with plaintiff's attention and concentration.[71]  Furthermore, Dr. Blanco denied being able to completely relieve plaintiff's pain through medication without unacceptable side effects.[72]  Rather, Dr. Blanco opined plaintiff could not work because he "would need to be taken off all

---

[64] D.I. 7-10 at 531-33.
[65] *Id.* at 532.
[66] *Id.* 532-24.
[67] D.I. 7-11 at 663-69.
[68] *Id.* at 663-64.
[69] *Id.* at 664.
[70] *Id.* at 665.
[71] D.I. 7-11 at 665-67.
[72] *Id.* at 666.

medications . . . to perform an occupation," which plaintiff could not tolerate.[73]

In both questionnaires, Dr. Blanco cites August 31, 2010 as the "earliest date that the description of symptoms and limitations applies," a date identified as plaintiff's first visit to his office.[74]

### 2. State Agency RFC Assessment

Non-treating medical experts for the Agency reviewed plaintiff's medical record on two separate occasions – initially on the filing of plaintiff's Title II application and again upon reconsideration of the Agency's denial of benefits.

Dr. Vinod K. Kataria completed the first residual functional capacity ("RFC") assessment on March 15, 2012.[75] After reviewing all the medical evidence in the record at that time, Dr. Kataria determined plaintiff's alleged functional limitations were not supported by physical exam findings.[76] While Dr. Kataria found some postural and environmental limitations, he concluded that plaintiff had the RFC to perform "light work."[77]

Plaintiff's file was reviewed again on October 3, 2012 by Dr. Jose Acuna.[78] Plaintiff alleged his conditions worsened since his last disability report and he experienced difficulty walking, standing, and breathing.[79] Dr. Acuna determined, however, that a significant worsening of plaintiff's underlying condition was

---

[73] *Id.* at 669.
[74] D.I. 7-10 at 535; D.I. 7-11 at 669.
[75] D.I. 7-7 at 376.
[76] *Id.* at 378.
[77] *Id.* 378-80.
[78] D.I. 7-8. at 393.
[79] *Id.*

uncorroborated by the total medical evidence, including additional records provided by plaintiff since Dr. Kataria's initial assessment.[80]  Dr. Acuna specifically referenced Dr. Blanco's findings regarding plaintiff's motor strength, range of motion, muscle tone, and stability on medication as noted in an office visit as recently as August 2012.[81]  He concurred with Dr. Kataria's RFC of "light work."[82]

### B.    Hearing Testimony

#### 1.    Plaintiff's Testimony

At the hearing on April 17, 2014, plaintiff testified to his background, education, work history, and his alleged disability.[83]  He completed high school and two years of college.[84]  He lives in Bear, Delaware with his girlfriend.[85]  His girlfriend does not work and is not disabled.[86]

Plaintiff was last employed in June 2009 as a police officer with the NYPD.[87]  He retired from the force after a "clogged artery" in his heart required placement of a stent in December 2009.[88]  Plaintiff testified that this heart condition "automatically disqualified" him from working as an officer.[89]  He receives a monthly pension from New York in the amount of "$5,700 and change" as part of his Article 2 Heart Bill.[90]  He

---

[80] *Id.*
[81] *Id.*
[82] D.I. 7-8 at 393.
[83] *See generally* D.I. 7-2 at 50-76.
[84] D.I. 7-2 at 53.
[85] *Id.*
[86] *Id.*
[87] *Id.* at 54-55.
[88] D.I. 7-2 at 55.
[89] *Id.*
[90] *Id.* at 54.

testified he has not performed nor sought any work since June 2009.[91]

The primary bases for plaintiff's disability claim are his heart condition and his back pain and spine impairments. At the hearing, plaintiff described his heart condition as "pretty good thank God."[92] He only sees his cardiologist twice a year for "basic routine follow-ups" and generally does not experience symptoms.[93] The bulk of his testimony focused on the severity of his back pain and spine impairments.

Plaintiff testified seeing Dr. Blanco for his back pain "once a month" since 2010.[94] He uses pain medication as prescribed by Dr. Blanco, namely a Fentanyl patch and "Oxycodone as needed."[95] Apart from the medications, he receives no other treatment for his back pain.[96] Specifically, plaintiff denied undergoing any surgery and maintained he last received epidural injections in "2005, 2006 maybe," while he still employed with the NYPD.[97] After further questioning on this point from the ALJ, plaintiff confirmed that before his disqualifying heart condition in 2009, he worked despite the back pain.[98]

Plaintiff claimed to suffer several significant physical limitations as a result of back pain.[99] He "used to be so strong," but is now only able to lift and carry about 10-20 pounds total.[100] He professed profound difficulty sitting, standing, and walking.[101]

---

[91] *Id.* at 54-55.
[92] D.I. 7-2. at 59.
[93] *Id.* at 56, 59.
[94] *Id.* at 59-60.
[95] *Id.* at 60.
[96] D.I. 7-2 at 60.
[97] *Id.* at 60-61.
[98] *Id.* at 61.
[99] *Id.* at 62-63.
[100] D.I. 7-2 at 62, 66.
[101] *Id.* at 62.

When pressed by the ALJ for details, plaintiff testified that he could only sit for 15-20 minutes and stand for 5-10 minutes at a time.[102]  As a result, he can only walk about half a city block before requiring "a little break."[103]  During his testimony, plaintiff twice requested permission to change positions from sitting to standing.[104]

Despite these limitations, plaintiff testified on the advice of his doctors, he remains as active as possible, because if he does not "use it," he will "lose it."[105]  Although he usually exercises at home, he recently joined the YMCA, where he walks on the treadmill for 5 minutes at a time.[106]  He emphasized that if he "overdo[es]" physical activity, he "will pay for it dearly that evening."[107]  Apart from light anaerobic exercise, plaintiff does a variety of household activities, such as cleaning, laundry, some cooking, and washing dishes.[108]  He further testified to driving, food shopping, and going to the movies "maybe once a week" with his girlfriend.  He is able to "make it through [the movie] okay," despite having to move around and potentially "distract[]" other moviegoers.[109]  He enjoys reading, listening to music, walking "in small doses," and laying tracks for his model trains.[110]

During subsequent questioning by his attorney, plaintiff clarified some of his previous answers.[111]  He described the pain he experiences if he overdoes the treadmill

---

[102] *Id.*
[103] *Id.*
[104] D.I. 7-2 at 62, 68
[105] *Id.* at 63.
[106] *Id.*
[107] *Id.*
[108] D.I. 7-2 at 65.
[109] *Id.*
[110] *Id.*
[111] *Id.* at 66.

as "very uncomfortable, extremely so."[112] He stated he sometimes "feels like" his spine is filling with fluid and becoming inflamed, a phenomenon his doctor cannot explain.[113] He checks his model trains once a day, just to watch them go around the track for a few minutes; if they require maintenance, he will "plan something and then do it another day."[114] Plaintiff stated that he sleeps only sporadically because of pain and must lie down during the day "for a couple of hours" if he "walk[s] a little more than five minutes . . . at the gym."[115] Similarly, if plaintiff shops, he has to "go home and rest."[116] He has trouble concentrating when the pain is "really getting to [him]," but his pain medication makes it "better . . . manageable," even when pain does not subside completely.[117] Finally, plaintiff testified "other than the pain and discomfort," there is nothing else preventing him from working.[118]

## 2. Vocational Expert's Testimony

During the hearing, the vocational expert, Edelmann, was asked to consider several hypothetical situations involving a hypothetical individual of plaintiff's age, education, and past work history.[119] Initially, he was asked to assume that the individual was functionally capable of light work, provided the work did not require more than occasional postural activities, climbing, or exposure to heights or hazards.[120] After

---

[112] D.I. 7-2 at 67.
[113] *Id.*
[114] *Id.* at 68.
[115] *Id.* at 69.
[116] D.I. 7-2 at 69.
[117] *Id.*
[118] *Id.* at 70.
[119] *Id*. at 72
[120] D.I. 7-2 at 72.

Edelmann confirmed this profile would not support plaintiff's former work as a New York City police officer, the ALJ asked whether there existed any light, unskilled work in the job market matching the individual's capability and limitations. Edelmann testified such jobs existed and provided examples of positions, along with the estimated numbers for these positions available in the national economy.[121] His first suggestion was an electrical accessories assembler, with approximately 5,000 jobs available nationally.[122] He then listed the positions of sales attendant and retail maker, with 100,000 and 52,000 jobs available respectively.[123]

Next, Edelmann was asked to consider the same individual, who also required as many as three hours of rest most days, per plaintiff's testimony.[124] If the ALJ credited that testimony, Edelmann testified that no full-time work at any exertional level would be available.[125] Similarly, Edelmann testified that if the ALJ accepted Dr. Blanco's assessment regarding plaintiff's inability to sit, stand, or walk for a combined period of about three hours out of an eight hour work day, no work was available.[126]

Plaintiff's attorney asked whether an individual likely to be absent from work more than three times a month (as Dr. Blanco so indicated) would be able to work.[127] Edelmann testified absences of that frequency would be "unacceptable" and accordingly, there are no jobs such an individual could perform.[128]

---

[121] *Id.*
[122] *Id.*
[123] *Id.* at 73.
[124] D.I. 7-2 at 73.
[125] *Id.*
[126] *Id.*
[127] *Id.* at 74.
[128] D.I. 7-2. at 74.

Plaintiff's attorney further pressed Edelmann to clarify whether any of the light, unskilled positions he mentioned would allow for "a sit/stand option at the person's own discretion."[129]  Edelmann stated that two of the three jobs – retail marker and assembler – would so allow, although at a reduction in productivity of 50% and 30% respectively.[130]  Plaintiff's attorney then asked whether productivity would be reduced "too much" by an individual needing to "move around every 30 minutes for 10 minutes," another limitation noted by Dr. Blanco.[131]  Edelmann testified generally that if for any reason the individual's production rate fell 15% below the rate of an average worker, he "would not be able to maintain the job."[132]

### 3.  The ALJ's Findings

Based on the record evidence and testimony presented, the ALJ determined plaintiff was not disabled and, thus, ineligible for DIB.[133]  The ALJ's findings are summarized as follows:

> 1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015.

> 2.  Plaintiff has not engaged in substantial gainful activity since June 30, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

> 3.  Plaintiff has the following severe impairments: cardiac disorder, status post stent, back disorder, and diabetes mellitus (20 CFR 404.1520(c)).

> 4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

---

[129] *Id.*
[130] *Id.* at 74-75.
[131] *Id.* at 75.
[132] D.I. 7-2 at 75.
[133] *Id.* at 23.

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. Plaintiff has the residual functional capacity to perform light work as define in 20 CFR 404.1567(b), except he can perform no more than occasional postural activity and no climbing or exposure to heights or hazards.

6. Plaintiff is unable to perform any past relevant work (20 CFR 404.1565).

7. Plaintiff was born on May 20, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. Plaintiff has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform (20 CFR 404.1569 and 404.1569(a)).

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from June 30, 2009, through the date of decision (20 CFR 404.1520(g)).

Conclusively, the ALJ determined "based on the application for a period of disability and disability benefits filed on December 28, 2011, [plaintiff] is not disabled under sections 216(i) and 223(d) of the Social Security Act."[134]

---

[134] *Id.* at 34.

## III. STANDARD OF REVIEW

### A. Motion for Summary Judgment

In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[135] If there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[136]

This standard does not change merely because there are cross-motions for summary judgment.[137] Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[138]

"The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[139]

### B. Review of ALJ's Findings

Section 405(g) sets forth the standard of review of the ALJ's decision by the district court. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not include substantial evidence to support the ALJ's decision. The Commissioner's factual decisions are

---

[135] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

[136] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

[137] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[138] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[139] *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

upheld if supported by substantial evidence.[140]  Substantial evidence means less than a preponderance of the evidence, but more than a mere scintilla of evidence.[141]  As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[142]

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record.[143]  The court's review is limited to the evidence that was actually presented to the ALJ.[144]  The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion."[145]  Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable.[146]  Even if the court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as that decision is supported

---

[140] 42 U.S.C. *§§* 405(g), 1383(c)(3); *see also Monsour Medical Center v. Hecklem*, 806 F .2d 1185, 1190 (3d Cir. 1986).
[141] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).
[142] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).
[143] *Monsour*, 806 F.2d at 1190.
[144] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001)
[145] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).
[146] *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

by substantial evidence.[147]

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision.[148]  In *Securities & Exchange Commission v. Chenery Corp.*,[149] the Supreme Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[150]  The Third Circuit has recognized the applicability of this finding in the Social Security disability context.[151]  Thus, this court's review is limited to the four corners of the ALJ's decision.[152]

### C.    ALJ's Disability Determination Standard

The Supplemental Social Security Income (SSI) program was enacted in 1972 to assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[153]  In order to establish SSI eligibility, a claimant bears the burden of proving that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

---

[147] *Monsour*, 806 F .2d at 1190-91.

[148] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).

[149] *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

[150] *Id.*

[151] *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001).

[152] *Cefalu v. Barnhart*, 387 F. Supp.2d 486, 491 (W.D. Pa. 2005).

[153] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than twelve months."[154]  Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy."[155]  Furthermore, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are evidenced by medically acceptable clinical and laboratory diagnostic techniques.[156]

### 1.    Five-Step Test

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[157]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are 'severe', she is ineligible for disability benefits.  In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her

---

[154] 42 U.S.C. § 423(d)(1)(A).
[155] 42 U.S.C. § 423(d)(2)(A).
[156] 42 U.S.C. § 423(d)(3).
[157] *See* 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).

past relevant work.  If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  The ALJ will often seek the assistance of a vocational expert at this fifth step.[158]

If the ALJ determines that a claimant is disabled at any step in the sequence, the analysis stops.[159]

### 2. Weight Given to Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[160]  Yet such reports are only given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.[161]  After considering all the evidence, the ALJ "may afford a treating physician's opinion more or less weight," provided he "give some reason for discounting the evidence [he] rejects."[162]

---

[158] *Plummer*, 186 F.3d at 427.
[159] *See* 20 C.F.R § 404.1520(a)
[160] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)
[161] *Fargnoli*, 247 F.3d at 43.
[162] *Plummer,* 186 F.3d 422 at 429; *see also Burnett v. Comm'r of Soc. Sec. Admin*, 220 F.3d 112 (3d Cir. 2000).

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion; rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[163]  Therefore, only the ALJ can make a disability determination.

### 3.       Evaluation of Subjective Accounts of Pain[164]

Statements about the symptoms[165] alone never establish the existence of any impairment or disability.  The Social Security Administration uses a two-step process to evaluate existence and severity of symptoms.

### i.       Existence of Pain

First, the ALJ must find a medically determinable impairment – proven with medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms.  Otherwise, the ALJ cannot find the applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence and limiting effects of the symptoms on the claimant:  it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 CFR Part 404, Subpart P, Appendix 1, because the

---

[163] *See* 20 C.F.R. § 416.927 (e)(1).
[164] *See* 20 C.F.R §§ 416.928-29.  *See also* SSR 96-7p.
[165] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints. *See* SSR 96-7p.

claimant is considered disabled *per se*.

### ii.    Severity of Pain

At step two, the ALJ must determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  Therefore, he must determine the applicant's credibility.[166]

At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the claimant's statements about symptoms, any other information provided by treating or examining physicians, psychiatrists and psychologists, and any other relevant evidence in the record, such as the claimant's account of how the symptoms affect his activities of daily living and ability to work.[167]

Where more information is needed to assess a claimant's credibility, the ALJ must make every reasonable effort to obtain available information that would shed light on that issue.  Therefore, the ALJ must consider the following factors relevant to symptoms, only when such additional information is needed:

(i)  The applicant's account of daily activities;

(ii)  The location, duration, frequency, and intensity of pain or other symptoms;

(iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication the applicant takes or has taken to alleviate pain or other symptoms;

---

[166] Credibility is the extent to which the statements can be believed and accepted as true.
[167] *See* 20 C.F.R. § 404.1529.

24

(v)  Treatment, other than medication, the applicant receives or has received for relief of pain or other symptoms;

(vi)  Any measures the applicant uses or has used to relieve pain or other symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)  Other factors concerning functional limitations and restrictions due to pain or other symptoms.[168]

### 4.    Factors in Evaluating Credibility[169]

A claimant's statements and reports from medical sources and other persons with regard to the seven factors, noted above, along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's credibility.  Since the effects of symptoms can often be clinically observed, when present, they tend to lend credibility to a claimant's allegations.  Therefore, the adjudicator should review and consider any available objective medical evidence concerning the intensity and persistence of pain or other symptoms in evaluating the claimant's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may indicate

---

[168] *See* 20 C.F.R. § 404.1529
[169] *See* SSR 96-7p.

that the symptoms are a source of distress and generally support a claimant's allegations.  An applicant's claims, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis.  Such opinions are not given controlling weight.  However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability.  The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain, that is, provide sufficiently specific reasons based on the record, to the claimant and any subsequent reviewers, regarding the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when evaluating the credibility of her testimony or statements.[170]  A claimant's testimony is accorded substantial credibility when he has a long work history, if it is unlikely that, absent pain, he would have ended employment.[171]

---

[170] *See* 20 C.F.R. § 404.1529(a)(3)
[171] *See Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984) citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981).  In *Podedworny*, the claimant

### 5. Medical Expert Testimony

The onset date of disability is determined from the medical records and reports and other similar evidence, which requires the ALJ to apply informed judgment.[172]  At the hearing, the ALJ should call on the services of a medical advisor when onset must be inferred.[173]

## IV. DISCUSSION

### A. Parties' Contentions

On appeal, plaintiff asserts the ALJ failed to properly weigh the medical opinion evidence.[174]  Specifically, plaintiff claims that the ALJ ran afoul of the "treating physician rule" in giving more evidentiary weight to the opinion of two non-treating agency physicians than that of plaintiff's treating physician, Dr. Blanco.[175]  Even if Dr. Blanco's opinion could not be afforded controlling weight, plaintiff argues it was still entitled to "greatest weight" under the factors provided in 20 CFR §§ 404.1527, 416.927.[176]

Plaintiff also alleges the ALJ failed to evaluate the credibility of his statements about the severity of his symptoms and his resulting functional limitations.[177]  According

---

worked for thirty-two years as a crane operator for one company.  He had a ninth grade education and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.

[172] *See* SSR 83-20.

[173] *Id.*

[174] D.I. 11 at 1.

[175] *Id.* at 11-12 (citing *Jones v. Astrue*, No. 12-579-GMS, 2015 WL 4404890, *7 (D. Del. July 20, 2015) for explanation of this rule).

[176] *Id.* at 15 (citing SSR 96-2p).

[177] *Id.* at 1.

to plaintiff, the ALJ's credibility assessment was improperly based on "[the ALJ's] lay interpretation" of the relevant medical evidence and the same "faulty reasoning" applied in his consideration of Dr. Blanco's opinion evidence.[178]  Plaintiff maintains that due to the diagnostic difficulty posed by his symptoms, a credibility assessment cannot be made "solely" on a lack of objective medical evidence.[179]

In response, defendant contends the ALJ was correct to afford less weight to Dr. Blanco's opinion because the severity and scope of the limitations noted therein were inconsistent with the medical evidence as a whole.[180]  This includes inconsistencies reflected in plaintiff's testimony, Dr. Blanco's own physical examinations in the months before and after the disability application, and several other physicians with whom plaintiff discussed his back pain.[181]  As a result, defendant argues the ALJ's decision to discount Dr. Blanco's opinion and credit the agency medical experts' opinion instead was supported by substantial evidence.[182]

Defendant further asserts the ALJ's credibility assessment was well-supported by plaintiff's testimony, treatment history, his ADL, and opinion evidence, in addition to the objective medical evidence in the record.[183]  The ALJ considered this evidence as a whole and concluded that it did not support plaintiff's subjective statements.[184] Defendant, however, emphasizes the ALJ "did not reject [p]laintiff's allegations outright"

---

[178] D.I. 11 at 16-17.
[179] *Id.*
[180] D.I. 13 at 8-9.
[181] *Id.*
[182] *Id.* at 11 (citing *Brown v. Astrue*, 643 F.3D 193, 196 (3d Cir. 2011)).
[183] *Id.* at 13-14; *See also* D.I. 7-2 at 27.
[184] D.I.13 at 14; *See also* D.I. 7-2 at 27.

and instead reasonably credited his testimony to the extent they were supported by the record.[185]  Therefore, defendant maintains that the ALJ's credibility assessment is supported by substantial evidence and should be affirmed.[186]

## B.    Disability Analysis

The ALJ determined that plaintiff was not disabled under sections 216(i) and 223(d).  This court must decide whether the ALJ properly applied the relevant legal standards in making his determination – specifically, whether "substantial evidence" supports his decision.  If this standard is not met, then this court may reverse the Commissioner's final determination that plaintiff is not disabled under the Act.

Plaintiff's main contentions are the following:  (1) the ALJ failed to properly weigh the medical opinion evidence, and (2) the ALJ failed to properly evaluate plaintiff's credibility.  Therefore, this court's decision is based upon whether the ALJ's analysis of these assertions within the entire disability determination was reasoned in a manner meeting the required standards.

## 1.    Weight Accorded to Opinion Evidence

In weighing medical opinion evidence, the ALJ considers the entire evidentiary record as whole.  If a treating source's medical opinion is well-supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, it will be given controlling weight.[187]  If not

---

[185] D.I. 13 at 15-16.
[186] *Id.* at 13.
[187] *See supra* Part III (C)(2).

given controlling weight, the ALJ must explain his reasons for the weight given to the medical opinion evidence.[188]

Here, the ALJ gave "little evidentiary weight" to Dr. Blanco's statements in the Spinal Impairment Questionnaires for two reasons: (1) the level of incapacity described was unsupported by the objective findings on record, "including the absence of disc herniation or neurological deficits," and (2) the opinion was inconsistent with plaintiff's history of conservative treatment and his "wide range of daily activities."[189]

Plaintiff argues that the ALJ's assessment of Dr. Blanco's opinion is essentially based on the ALJ's "'own speculation and lay opinion.'"[190] Plaintiff further contends that the ALJ "failed to cite to any medical or legal authority" that would contradict Dr. Blanco's opinion.[191] However, because the ALJ's decision is properly supported by substantial evidence after a consideration of the record as a whole, there is no error in the weight accorded to the opinion evidence.

Rather than relying on speculation or lay opinion as plaintiff alleges, the ALJ noted the specific and substantial inconsistences between Dr. Blanco's opinion and the record evidence as a whole, including the objective findings made during plaintiff's office visits with him from 2010 through 2013.[192] The ALJ pointed out that the findings included a physical and focused lumbar examination which consistently revealed normal motor and sensory function, normal muscle tone, and normal joint stability; a

---

[188] *See supra* Part III (C)(2).
[189] D.I. 7-2 at 31.
[190] D.I. 11 at 13 (citing *Morales*, 225 F.3d 310, 317-318).
[191] *Id.* at 12.
[192] D.I. 7-2 at 30-31.

range of motion within normal limits; a lack of pain behavior or antalgia; an ability to heel-toe walk without pain or difficulty; and appropriate mood and affect.[193]  These findings are repeated in several visits of other treating physicians, including Dr. Xiong and Patricia Pugni, NP, associates of Dr. Blanco at Westmed.[194]

Observing that plaintiff's treatment by Dr. Blanco remained "routine" and "conservative," the ALJ found such a history of treatment to belie the level of incapacity described by Dr. Blanco.[195]  Plaintiff testified that since the onset of his alleged disability, he had not received nor had he sought any injections or surgical relief for his back and spine.[196]  Indeed, plaintiff twice refused injections during the relevant period.[197]  The ALJ noted how through pain medication alone, plaintiff was able to increase his physical activities and overall quality of life without experiencing any adverse side effects.[198]

The ALJ found this increase in physical activity significant, given the extreme limitations on plaintiff's physical activity described by Dr. Blanco.[199]  At points during his treatment, plaintiff was bicycling for twenty minutes once or twice a week and walking two miles before exacerbating his back pain.[200]  During the hearing, plaintiff recounted going to the movies, working out at the gym, grocery shopping, and driving.[201]  While

---

[193] *Id.*
[194] *Id.* at 30-31.
[195] *Id.* at 28, 31.
[196] D.I. 7-2 at 60-61.
[197] D.I. 7-10. at 609, 622.
[198] D.I. 7-2 at 28, 30; *See also* D.I. 7-10 at 611.
[199] D.I. 7-2 at 31.
[200] *Id.* at 30.
[201] *Id.* at 63-65.

reports of increased pain sometimes accompanied increased activity, the resulting pain was always well-managed by the medication – to the point that plaintiff decreased or discontinued his pain medication on several occasions.[202]  The ALJ found the submission of nearly a year's worth of additional pain management records after the hearing only reinforced plaintiff's stability on medication.[203]  Furthermore, the lack of new examination findings in these records did not support a worsening of plaintiff's condition.[204]

In sum, the ALJ thoroughly explained how the objective findings, treatment history, and scope of daily activities were inconsistent with Dr. Blanco's assertion that plaintiff was incapable of even less than sedentary work on a sustained basis.[205]  As noted previously, a treating physician's medical opinion is only afforded controlling weight when the opinion of an individual's impairment is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial record evidence."[206]  Taken together, the objective findings, history of conservative treatment, and range of ADL reflected in the record reasonably rebut the level of incapacity described by Dr. Blanco in his Spinal Questionnaires.  For this reason, the ALJ applied the correct legal standards and did not err in affording Dr. Blanco's opinion less weight.

---

[202] *Id.* at 28, 30-31, 69.
[203] D.I. 7-2 at 31.
[204] *Id.* at 31.
[205] *Id.* at 31.
[206] *See supra* Part III (C)(2).

## 2.      Credibility Assessment

The ALJ assesses a claimant's subjective account of pain in a two-part analysis. The first part requires the ALJ to find "a medically determinable impairment – proven with medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms."[207]  The second part requires the ALJ to "determine the extent to which the symptoms limit the claimant's ability to do basic work activities."[208]  The credibility of the claimant is thus an important part of the overall disability analysis.  In assessing credibility, the ALJ considers the entire record, including a variety of factors, such as the character of the symptoms, the type of treatment, the response to treatment, and a claimant's daily activities.[209]

Here, the ALJ acknowledged the existence of medically determinable impairments, but maintained doubts regarding "the intensity, persistence, and limiting effects" the symptoms produced.[210]  Ultimately, the ALJ found plaintiff's subjective account of the effect of his impairments to "far outweigh the objective and clinical findings."[211]  While the ALJ did find some limitation in plaintiff's ability to work, the limitations were simply "not to the degree alleged."[212]

Plaintiff objects to the credibility assessment on the basis that the ALJ relied on a lay understanding of the objective medical evidence, instead of relying on the opinion of

---

[207] *Id.*
[208] *Id.*
[209] *See supra* Part III (C)(3)(ii) and Part III (C)(4).
[210] D.I. 7-2 at 27.
[211] *Id.* at 28.
[212] *Id.* at 27.

a treating physician like Dr. Blanco.[213]  At the same time, plaintiff claims the ALJ placed

too much emphasis on the objective medical evidence, as some symptoms "cannot be

measured objectively through clinical or diagnostic techniques."[214]  However, because

the ALJ's decision is supported by substantial evidence upon consideration of the entire

record, there is no error in his credibility assessment.

Much of the same evidence that discounted Dr. Blanco's opinion operated to

weaken the plaintiff's credibility.  The number of significant inconsistencies between

plaintiff's subjective complaints and the objective medical findings of record were

crucial.[215]  Specifically, the ALJ indicated the lack of "disc herniation, nerve root

compression, or significant neurological deficit," and a long history of normal physical

exam findings, including notes on plaintiff's lack of pain behavior and appropriate mood

and affect.[216]   As the ALJ emphasized, there was no evidence in the record that

plaintiff's gait, stance, balance, or coordination are significantly disturbed.[217]  Plaintiff

has not been prescribed an assistive device for ambulation and he does not use any

orthotic brace or device.[218]  Despite testifying to the severity of pain he suffers if he

overdoes even five minutes of physical activity, the ALJ noted that plaintiff has not

required hospitalization, surgical intervention, or frequent emergency medical care for

his pain.[219]  Furthermore, the ALJ found nothing in the record to support the allegation

---

[213] D.I. 11 at 16.
[214] D.I. 11 at 17.
[215] *See* D.I. 7-2 at 28.
[216] *Id.* at 28 and 30.
[217] *Id.*
[218] *Id.*
[219] *Id.* at 28, 62, 67.

that plaintiff's pain "is so severe that it impacts his attention, memory, or concentration."[220]  Instead, he found the pain to be  "mild to moderate . . . at most," subject to only routine conservative treatment, and well-managed by the prescribed medications.[221]

Plaintiff's testimony compounded these inconsistencies.  The ALJ found the plaintiff's wide-range of activities, including "walking, using the treadmill, going for drives, going to the movies once a week . . . working with model trains" and "household cleaning, cooking, doing laundry, washing dishes, and grocery shopping,"  to "contraindicate severe pain and other symptoms."[222]  Ultimately, the ALJ asserted that while plaintiff's pain may prevent him from "heavy exertional tasks," there was nothing to suggest plaintiff could not perform "less strenuous tasks" or complete "non-strenuous daily activities with little difficulty."[223]

The ALJ's findings are not improper lay interpretations or inferences, but rather well-reasoned conclusions supported by the record.  As the ALJ detailed in his decision and defendant correctly points out, where plaintiff's representations are not substantiated by the objective medical evidence, the ALJ is entitled to make a finding based on a consideration of the entire record.  Having done so, the ALJ's credibility assessment is supported by substantial evidence and is therefore not in error.

---

[220] D.I. 7-2 at 28.
[221] *Id.*
[222] *Id.*
[223] *Id.*

## V. CONCLUSION

For the reasons contained herein, I recommend that:

1. Plaintiff's motion for summary judgment (D.I. 10) be DENIED.

2. Defendant's cross-motion for summary judgment (D.I. 12) be GRANTED.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), FED. R. CIV. P. 72 (b), and D. DEL. LR 72.1, any objections to this Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same. Any response shall be limited to ten (10) pages and filed within fourteen (14) days thereafter.

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under FED. R. CIV. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov.).

Date: April 2, 2019                                    /s/ Mary Pat Thynge                              
                                                       Chief U.S. Magistrate Judge